IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CECIL D.B. KING, JR., *et al.*                          )
                                                        )
                    Plaintiffs,                         )
v.                                                      )          Civil Action No.  1:12-cv-1230 (AJT/TCB)
                                                        )
THE BANK OF NEW YORK MELLON                             )
CORPORATION, NB                                         )
                                                        )
                    Defendant.                          )
_____)

## MEMORANDUM OPINION

Plaintiff Cecil D.B. King, Jr. and his siblings ("Plaintiffs") seek payment with respect to five Certificates of Deposit ("CDs") they obtained from their father's estate. Each CD is dated July 27, 1976, in the face amount of $1,000,000, issued by the First National Bank of Chicago ("FNBC"), and made payable to "Bearer" ("Bearer CDs"). In July 1977, the CDs matured and the full amount of principal and interest due and payable under those CDs, just over $5.3 million, was paid on behalf of the issuer, FNBC, to Irving Trust Company ("ITC"). At the time of payment, ITC had physical possession of the CDs. Plaintiffs claim under a variety of theories that defendant Bank of New York Mellon ("BNYM"), ITC's successor in interest, currently owes them the $5.3 million ITC received from FNBC in 1977, plus interest.

The parties filed cross-motions for summary judgment [Doc. Nos. 57 & 60], on which a hearing was held on June 7, 2013. Following that hearing, the Court took the motions under advisement. Upon consideration of the motions, the memoranda filed in support thereof and in opposition thereto, the exhibits submitted in connection therewith, the arguments of counsel at the hearing, and for the reasons stated in this Memorandum Opinion, the Court finds and

1

concludes that based on undisputed facts, defendant BNYM is entitled to judgment in its favor as a matter of law. The Court will therefore DENY Plaintiffs' motion [Doc. No. 57] and GRANT the defendant's motion [Doc. No. 60].

**Facts & Procedural History**

On July 28, 1977, the date on which the CDs matured, Morgan Guaranty Trust Company of New York ("Morgan Guaranty"), acting as an agent of FNBC, paid ITC the amount due on each of the five CDs ($1,065,902.78 each), representing the stated principal, plus accrued interest, for a total payment of $5,329,513.90 ("$5.3M"). Each of the CDs has on its backside two stamps.[1] The first, nearest to the top lengthwise edge of the CD, reads as follows:

RECEIVED PAYMENT 1-67
All Prior Endorsements Guaranteed

Jul 28 1977
IRVING TRUST COMPANY
MONEY MARKET SAFEKEEPING DEPARTMENT
1-67.

The second stamp, which appears below the *above* stamp, is undated and reads:

MORGAN GUARANTY TRUST OMPANY
OF NEW YORK
TELLERS DEPARTMENT 23 WALL ST.

Pls.' Mem. Law Supp. Pls.' Mot. Summ. J., Doc. No. 58, Exs. 1-5 [hereinafter "Mem. Supp. MSJ"]. Plaintiffs also have in their possession a "credit ticket"—an internal banking document issued by Morgan Guaranty,[2] which reflects the $5.3M payment by Morgan Guaranty to ITC on July 28, 1977. Mem. Supp. MSJ 4, ¶¶ 9-10 & Ex. 6; Compl. 8, ¶ 14, Doc. No. 1, Ex. A. Plaintiffs

---

[1] The Complaint refers to these CDs, with the stamps, as "Bearer CD Receipts."

[2] According to the defendants, "[t]he Credit Ticket is an internal banking record used for Morgan Guaranty's bookkeeping records purposes" and is the type of "document[] that [was] never intended to leave Morgan Guaranty. . . ." Defs.' Mem. Opp'n Pls.' Mot. Summ. J. 15, Doc. No. 67 [hereinafter "Mem. Opp'n MSJ"].

found the Bearer CDs and the credit ticket among the items they received from the estate of their father who passed away on August 11, 1998.

On July 28, 2010, more than ten years after coming into possession of the CDs and more than thirty years after the CDs had matured and were paid by Morgan Guaranty, Plaintiffs initiated their collection efforts by sending a letter to BNYM's General Counsel's Office, requesting payment of the CDs. Aff. Daniel Sterling, Doc. No. 62, Ex. A. In its response letter dated August 10, 2010, BNYM advised that "the King family must present these certificates to The First National Bank of Chicago for payment as indicated on the face of the certificates."[3] Mem. Supp. MSJ, Ex. 8. Shortly thereafter, on August 13, 2010, Plaintiffs made a demand for payment on FNBC and Morgan Guaranty; both institutions refused that demand on the grounds that the CDs had already been paid in full to ITC on July 28, 1977, and that by virtue of that payment, FNBC and Morgan Guaranty were discharged from any further obligations or liability. Compl. 12, ¶ 29, Doc. No. 1, Ex. A. This lawsuit followed.[4]

---

[3] Responding through a senior paralegal from its General Counsel's Office, BNYM stated:

> We [BNYM] have researched this matter and from the documentation provided, we have determined that in July 1977, Irving Trust Company ("Irving") bought the certificates of deposit from Morgan Guarantee. On July 28, 1977, the stamps were placed on the back of the bonds, and the bonds were physically delivered to our client [ITC/BNYM]. As the King family is now in possession of the certificates and since they are "bearer" bonds, the King family must present these certificates to The First National Bank of Chicago for payment as indicated on the face of the certificates.

[4] The Complaint [Doc. No. 1-1] was originally filed in the Circuit Court for the City of Alexandria on October 5, 2012, and removed to this Court on November 2, 2012. By Order dated January 14, 2013 [Doc. No. 11], the Court, after a hearing, denied Defendant BNYM's Motion to Dismiss [Doc. No. 4]. At the close of discovery, both parties filed motions for summary judgment, presently before the Court; and by Order dated June 11, 2013 [Doc. No. 75], the Court vacated the scheduled trial date of June 24, 2013, pending its decision on the cross-motions for summary judgment.

Plaintiffs claim that as the current holders of the Bearer CDs, they are entitled to payment from BNYM under four different legal theories. In Count I, Plaintiffs claim that ITC's stamp on the back of each paid CD transformed the CDs into "Bearer Certificates of Deposit Receipts" ("CD Receipts"), instruments whose possession entitles them to receive the funds that ITC was paid on July 28, 1977.[5] In Count II, Plaintiffs claim that ITC's stamp constitutes its "payment guaranty" of the CDs under the Uniform Commercial Code ("U.C.C."), as adopted in New York. In Counts III and IV, Plaintiffs seek payment, separate and apart from any rights they may have under the U.C.C., based on common law contract and third-party beneficiary theories (Count III) and the equitable doctrines of quantum meruit, quantum valevant and unjust enrichment (Count IV).

BNYM seeks summary judgment with respect to Plaintiffs' claims on the grounds that, because the CDs had been paid in full by their issuer in 1977: (1) any payment obligations under those instruments have been discharged;[6] (2) ITC's stamp did not transform the CDs into "CD Receipts" that entitle Plaintiffs to the funds that ITC received for the CDs; (3) ITC's stamp does

---

[5] As discussed *infra*, plaintiffs may have in fact abandoned this theory and in its place seek relief under the U.C.C. based on the characterization of ITC's stamp as an "indorsement in blank" of a negotiable instrument.

[6] BNYM also argues in further support of this position that under New York case law there is a presumption of payment and discharge after twenty years following maturity of an instrument, and that Plaintiffs cannot, based on the summary judgment record, rebut this presumption by the required showing of non-payment by clear and convincing evidence. *See Krawitt v. KeyBank*, 871 N.Y.S.2d 842, 844 (Sup. Ct. 2008) ("New York State recognizes a legal presumption of payment after the lapse of twenty years between the right to enforce an obligation and an attempt to do so. . . . To rebut the presumption, clear and convincing evidence of nonpayment is required." (citing *Bean v. Tonnele*, 94 N.Y. 381 (1884))); *see also Morse v. Miller*, 39 N.Y.S.2d 815, 822 (Sup. Ct. 1943) *aff'd In re Catteau's Estate*, 267 A.D. 801, 47 N.Y.S.2d 288 (App. Div. 1943) ("An unexplained neglect to enforce an alleged right for a long period casts suspicion upon the existence of the right itself, especially where all who could gainsay it have died, and courts of equity, independent of positive legislative limitations, will not entertain such demands."). Because the Court has determined that BNYM is entitled to judgment as a matter of law on other grounds, the Court does not address the merits of this alternative position.

not under any theory entitle Plaintiffs to receive from ITC/BNYM what would, in effect, be a second satisfaction of the CDs; and (4) there is no evidence that supports Plaintiffs' common law contract or equitable claims.

### Standard of Review

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The party seeking summary judgment has the initial burden to show the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Id.*, 477 U.S. at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

However, "unsubstantiated, conclusory claims without evidentiary support are insufficient to

satisfy a non-moving party's burden on summary judgment." *Carter v. Ball*, 33 F.3d 450, 461-62

(4th Cir. 1994).

**Analysis**

1.  Count I: "Failure to Pay Money on Deposit After Demand."

The parties agree that New York law applies to this dispute. *See* Defs. Mem. Supp. Mot.

Dismiss 5, Doc. No. 5; *see also* Opp'n Defs. Mot. Dismiss 4, Doc. No. 7. Under the U.C.C., as

adopted in New York, payment to a "holder" of a CD upon maturity discharges all parties to that

instrument from liability on that instrument. *See* N.Y. U.C.C. §§ 3-601(3)(b) & 3-603.[7]

Apparently in light of these provisions, Plaintiffs allege in Count I that once ITC received the

amounts due and payable under the CDs, the CDs were transformed from one type of

commercial instrument, viz., negotiable instruments, into another—what they call "CD

Receipts." According to Plaintiffs, their possession of these CD Receipts entitles them to

"receive the principal and interest that was paid on July 28, 1977 to the Irving Trust Company

Money Market Safekeeping Department by The First National Bank of Chicago through Morgan

Guaranty." Compl. 12, ¶ 26.[8]

---

[7] The only exception to this rule of discharge is when an instrument "is negotiated to a subsequent holder in due course without notice of the discharge." N.Y. U.C.C. § 3-602. Plaintiffs do not contend that they are "holders in due course without notice of the discharge."

[8] In support of this claim, Plaintiffs argue that by placing its "payment received" stamp on each of the five CDs, ITC "acknowledged in writing that it had received $1,065,902.78 on each of the five Bearer Certificates of Deposit . . . for a total of $5,329,513.90 and deposited said $5,329,513.90 for Safe Keeping in its Money Market Department for the credit of the holder of the original of each of the said five Bearer Certificates of Deposit." Compl. 7, ¶ 11. Under this theory, Plaintiffs allege that "[t]he originals of the Bearer Certificates of Deposit, were delivered to their client [presumably referring to Plaintiffs' father] by Defendant BNY Mellon so the client and/or future holders of the said Bearer Certificates of Deposit 'Receipts' would have written

The difficulty with this position is that there is no legal support for it.[9] Plaintiffs have not cited any reference to bearer paper receipts in the U.C.C. or under any other New York statutes or case law, and the Court has found none. Neither the word "receipt," nor anything that specifically references anyone associated with the King family, appears on the CDs or in the records of FNBC, ITC, or BNYM. Nor is there anything about the language that appears in or on the CDs, including ITC's stamp, which evidences Plaintiffs' entitlement to funds paid to ITC over thirty years ago.[10] Plaintiffs rely heavily on the fact that the funds were received by a unit within ITC named the "Money Market Safekeeping Department." However, that reference does not allow the inference, let alone establish, that ITC was receiving the funds paid to it "for Safekeeping in its Money Market Department for the credit of the holder of the original of each of the said five Bearer Certificates of Deposit." *See* Compl. 7, ¶ 11. Nor is there anything about ITC's stamp that would allow the inference that ITC/BNYM delivered the CD Receipts "to their client [presumably, Plaintiffs' father] so that the client and/or future holders of the . . . 'Receipts'

_____

verification of their right to withdraw the proceeds from the Safekeeping Department of the then Irving Trust Company, now Defendant BYN Mellon, and take possession and ownership of said money." *Id.* at ¶ 12. Plaintiffs further claim that by virtue of the payments and ITC's endorsement stamp, "[t]he said Bearer Certificates of Deposit became Bearer Certificates of Deposit Receipts" and ITC received the funds paid with respect to the five CDs "in its fiduciary capacity." *Id.* at ¶¶ 12-13.

[9] Plaintiffs may have, in fact, abandoned their claim based on the theory of CD Receipts. *See* Pls' Reply Mem. 6, Doc. No. 68 ("BNYM incorrectly claims that Plaintiffs rely on an argument related to 'certificate of deposit receipts.' No reference was made by Plaintiffs to any such argument in their Motion for Summary Judgment, and BNYM is simply erecting non-existent straw men to knock down."). Nevertheless, the Court will rule on the merits of this claim, given BNYM's motion for summary judgment as to Count I, as pleaded.

[10] As best the Court can determine, Plaintiffs view these CD Receipts as akin to negotiable warehouse receipts for goods being held by a warehouseman, but in this case, for money being held in storage for the bearer of the receipt. *See* N.Y. U.C.C. § 7-101 *et seq.* However, there is no legal basis to treat these CD Receipts in such a similar fashion.

would have written verification of their right to withdraw the proceeds from [ITC's] Safekeeping Department . . . and take possession and ownership of said money." *Id.* at 7, ¶ 12.

Likewise, there is no evidence to support Plaintiffs' argument that the funds were received by ITC in a fiduciary capacity for the benefit of the plaintiffs or anyone through whom they claim. *Id.* at 7-8, ¶ 13. Moreover, Plaintiffs point to nothing, other than ITC's stamp itself, to establish that ITC's stamp has the significance Plaintiffs attribute to it or that ITC/BNYM is holding the $5.3M for their benefit. For instance, there is no evidence of any discussions, dealings, agreements, promises, or undertakings between ITC and any member of the King family or anyone through whom Plaintiffs claim.[11] There is no evidence that the King family ever deposited any funds with FNBC or ITC/BNYM, or that it ever paid any consideration for the CD Receipts.[12] For these reasons, the Court finds and concludes based on the undisputed

---

[11] Plaintiffs obtained discovery from BNYM concerning any dealings between ITC and the King family or any information related to the King name or the transactions at issue in this case. Aff. Daniel Sterling 4, ¶¶ 18 & 20, Doc. No. 62. That discovery included an extensive search of ITC/BNYM's records, a "global search" of its various business lines and interviews of more than thirty-five current and former employees. *Id; see also* Dep. Daniel Sterling 12:1-18:20, Doc. No. 58, Ex. E [hereinafter "Sterling Dep."]. Despite these searches and interviews, no information was found. Sterling Dep. 54:9-13. There is no evidence as to how the King family originally came into possession of the CD Receipts or that these CD Receipts were ever intended as the means by which the funds received under the CDs could be retrieved from ITC/BNYM. There is likewise no evidence that the CD Receipts were ever intentionally transferred by ITC/BNYM to anyone outside the bank. If anything, the sequence of stamps on the back of the CDs would suggest that the CDs, after payment, were surrendered to Morgan Guaranty, but subsequently were lost, stolen, or mistakenly provided to someone outside of that institution.

[12] Plaintiffs point to testimony from Sterling that funds in BNYM's money market safe keeping department are not considered the bank's money, but are being held on behalf of a customer. Sterling Dep. 50:10-21. BNYM contends that this testimony refers only to the bank's practice since 2001, and not the policy or practices of the money market safe keeping department prior to 2001, about which there is no evidence. Mem. Opp'n MSJ 11, ¶ 18(a). The Court finds this dispute immaterial, because even if the Court were to assume that the funds paid to ITC for the CDs were deposited for holding on behalf of a bank customer, there is no basis on which to conclude that the funds were being held on behalf of the King family or whoever was in physical possession of the CD Receipts.

facts that the defendant is entitled to judgment as a matter of law as to Plaintiffs' "CD Receipts" theory set forth in Count I.

Notwithstanding their claim based on the alleged transformation of the original CDs into CD Receipts, Plaintiffs also claim, ostensibly under Count I as well, that they are entitled to recover from BNYM the funds paid to ITC because ITC's stamp constituted an "endorsement in blank."[13] Under this theory, ITC's endorsement in blank obligates ITC/BNYM under the U.C.C to pay the face amount of the CDs, with interest, to any "holder" of the CDs. *See* U.C.C. § 3-415 ("Obligation of Indorser"); *see also* N.Y. U.C.C. §3-414(1) ("Contract of Indorser; Order of Liability").[14] Assuming, without deciding, that ITC's stamp satisfies the definition of an endorsement in blank, the Court concludes as a matter of law that ITC/BNYM has no obligation to pay any amount to Plaintiffs under ITC's posited contract of indorsement.

The contract of indorsement that Plaintiffs rely on is set forth in § 3-414(1) of the N.Y. U.C.C., which provides that "[u]nless the indorsement otherwise specifies (as by such words as 'without recourse') every indorser engages that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the time of his indorsement to the holder. . . ." Here, ITC's stamp clearly memorializes that the CDs have been

---

[13] The record and relevant statutes refer to "endorse" and "indorse." As both spellings are grammatically correct, and the words have identical meanings, the Court will use "endorse" (as spelled by the parties) when discussing the term generally and the parties' arguments, but will use "indorse" when citing or referring to, or quoting from, the N.Y. U.C.C., as this is the spelling used under the Code.

[14] Plaintiffs' position that the stamp constitutes an "endorsement in blank" under the U.C.C. appears to conflict fundamentally with their position that ITC's stamp transformed the CDs from a negotiable instrument into a "receipt" for the funds received by and deposited into ITC/BNYM. Moreover, this claim was not pled in Count I or any other count of the Complaint. Nevertheless, the Court will consider the merits of this claim given the parties' fulsome briefing on this issue, the defendant's lack of objection to this claim based on its absence from the Complaint, and the policies reflected in FED. R. CIV. P. 15.

paid. That notation is fundamentally inconsistent with any notion that there are amounts still

payable under the CDs and that ITC will pay those amounts pursuant to the terms of the

instrument, if the issuer does not. In short, ITC's stamp "otherwise specifies" with respect to

ITC's indorsement and the obligations set forth in N.Y. U.C.C. § 3-414.

Second, even assuming that ITC had assumed the obligations set forth in N.Y. U.C.C. §

3-414, it was discharged from those liabilities under N.Y. U.C.C. § 3-603,[15] when the $5.3 M

was paid on behalf of the issuer on July 28, 1977. In order to avoid this straight-forward

application of N.Y. U.C.C. § 3-603, Plaintiffs claim that there was no discharge of ITC under

N.Y. U.C.C. § 3-601, because (1) at the time ITC received the $5.3M payment, ITC was acting

as an agent for its client, Plaintiffs' father, and therefore was not a "holder" of the CDs; (2) the

CDs were never "surrendered" to FNBC; and (3) in any event, ITC was a "subsequent indorser,"

ostensibly unaffected by any discharge of FNBC.[16] None of these contentions has any merit.[17]

---

[15] Section 3-603 provides in pertinent part:

> (1) The liability of any party is discharged to the extent of his payment or satisfaction to
> the holder even though it is made with knowledge of a claim of another person to the
> instrument unless prior to such payment or satisfaction the person making the claim
> either supplies indemnity deemed adequate by the party seeking the discharge or enjoins
> payment or satisfaction by order of a court of competent jurisdiction in an action in which
> the adverse claimant and the holder are parties. . . .

[16] Plaintiffs allege in this regard the following:

> Morgan [Guaranty] did not pay funds under the Certificates of Deposit to the holder or
> bearer of the Certificates, but instead paid the funds to a subsequent endorser of the
> certificates, Irving/BNYM who by endorsing the Certificates agreed to pay the funds to
> the holder and bearer in the future. Irving/BNYM was clearly not a holder of [sic] bearer
> of the Certificates since it placed the money it received in its Money Market Safekeeping
> Department, an account to hold funds on behalf of a client. . . . To the extent
> Irving/BNYM possessed the Certificates to place the stamps on the back, it did so as an
> agent for its customer, not as the Bearer entitled to payment.

Mem. Supp. MSJ 12-13.

As a matter of law, ITC meets the definition of a "holder" of bearer paper because it was in possession of the CDs when it received payment. *See* N.Y. U.C.C. § 1-201(20) (defining a holder as "a person who is in possession of . . . an instrument or an investment . . . drawn, issued or indorsed . . . to bearer or in blank."). It is immaterial to ITC's status as a holder whether it was acting in that capacity as a principal or an agent.[18] Moreover, discharge under the N.Y. U.C.C. occurs upon payment of the instrument and does not require surrender of the certificates, although prudence would dictate that an issuer require surrender of the instrument after payment.[19] For these reasons, the $5.3M payment to ITC on July 28, 1977, the full amount then due upon the CDs' maturity, discharged both the issuer and ITC from any further liability on the instruments and Plaintiffs can no longer collect any funds under the terms of those instruments. Finally, even assuming that ITC's obligations under N.Y. U.C.C. § 3-414 were not discharged because ITC's stamp was affixed to the CDs after the $5.3M payment, the fact of payment of all amounts due and payable under the CDs on July 28, 1977, eliminates any further obligation by

---

[17] Plaintiffs also rely on BNYM's letter dated August 12, 2010, there is nothing in that letter that would change the legal consequences that otherwise result from the fact of payment and the stamps that appear on the CDs.

[18] This position is also inconsistent with Plaintiffs' decision not to sue FNBC and its apparent acknowledgement in its Complaint that by virtue of the $5.3M payment, FNBC has no further liability under the CDs. *See* Compl. 9, ¶ 16 ("Defendant BNY Mellon incorrectly stated that the said Bearer Certificates of Deposit should be presented to The First National Bank Of Chicago for payment.").

[19] Among the reasons that an issuer would require surrender of the instrument is that a discharge otherwise effected through payment may not be asserted against a subsequent holder in due course with no notice of payment. *See* N.Y. U.C.C. §§ 3-601(3)(b), 3-602(a), & 3-603. Surrender of the instrument is not a condition for discharge under the N.Y.U.C C., and the language in the CDs that they shall be payable "upon surrender thereof" does not affect the discharge that occurs as a matter of law under N.Y. U.C.C. § 3-603. In any event, Plaintiffs have no evidence that at some point the CDs were not surrendered to Morgan Guaranty after their payment. To the contrary, Morgan Guaranty's stamp on the back of the CDs indicates that the CDs were, in fact, surrendered to Morgan Guaranty before they somehow came into the possession of the King family.

ITC under the purported indorser's contract. In that regard, under § 3-415(a)(i) of the U.C.C.[20],

an indorser is obligated to pay only those amounts "due on the instrument" at the time of its

indorsement. By the time ITC endorsed the CDs, nothing remained unpaid by the issuer under

the terms of the CDs. For this reason, even if FNBC/Morgan Guaranty's refusal to pay the CDs a

second time constituted a "dishonor" of the already paid CDs, ITC/BNYM did not breach any

obligations as an indorser when it refused to pay the face amount of the CDs, plus interest,

because there was nothing more due and payable under those instruments.

In the end, Plaintiffs' contentions with respect to the legal effect of ITC's stamp cannot

be reconciled with either the governing law under the U.C.C. or the facts of this case. In effect,

Plaintiffs contend that ITC, through its "payment received" stamp, somehow revived or novated

the paid CDs and transformed them into enforceable commercial instruments, under which

ITC/BNYM became primarily liable, much like an issuer, to anyone who subsequently happened

to obtain possession of the CDs. However, there is nothing about N.Y. U.C.C. § 3-414(1) or

U.C.C. § 3-415(a)(i), or any other section of the U.C.C. for that matter, which would support this

contention. For the above reasons, the Court finds and concludes, based on undisputed facts, that

the defendant BNYM is entitled to summary judgment as a matter of law as to Count I.

2. Count II: Prior Endorsements Guaranteed

In Count II, Plaintiffs claim that ITC's stamp constituted a "payment guaranty." More

specifically, Plaintiffs contend that by including the phrase "All Prior Endorsements Guaranteed"

within its stamp, ITC "guaranteed that the Bearer Certificates of Deposits would be paid in full

by the Irving Trust Company, if the prior endorsers would not make said payments." Compl. 12-

13, ¶ 30. The Court rejects this contention as well as a matter of law.

---

[20] Section 3-415 provides "Obligation of Indorser: (a) Subject to subsections (b), (c), (d), (e) and
to Section 3-419(d), if an instrument is dishonored, an indorser is obliged to pay the amount due
on the instrument (i) according to the terms of the instrument at the time it was indorsed. . . ."

The phrase "All Prior Endorsements Guaranteed" does not constitute a "payment guarantee." *See* N.Y. U.C.C. §§ 3-416(1) & (5). Rather, it simply guarantees that the prior endorsers' signatures were valid and not forgeries. *See United States v. Guar. Trust Co. of N.Y.*, 293 U.S. 340, 349 (1934) ("The express guaranty of prior indorsements means no more than what is implied by every unrestricted indorsement, namely, that the indorsements were effective to give to the holder a legal title and the right to enforce payment of the check."); *see also Sec.-First Nat. Bank of Los Angeles v. United States*, 103 F.2d 188, 191 (9th Cir. 1939) ("Appellant's express guaranty of prior endorsements adds nothing to its liability."). Here, there is no contention that the signatures of FNBC, Morgan Guaranty, or any prior endorsers were not genuine, or, that they were forgeries. Plaintiffs' contention that ITC's stamp constituted a payment guarantee is particularly difficult in this case where the stamp made it clear that payment had already been made. For these reasons, the Court finds and concludes, based on undisputed facts, that the defendant BNYM is entitled to judgment as a matter of law as to Count II.

3. <u>Count III: Payment Due on Original Certificate of Deposit Not Completed by ITC</u>

Plaintiffs next argue that FNBC/Morgan Guaranty and ITC had a contract under which they (Plaintiffs) are third party beneficiaries. In support of this claim, Plaintiffs allege that at the time ITC received payment for the CDs, it represented to FNBC that it (ITC) would pay the proceeds to current or future holders of the CDs[21] and "provide an accounting and pay the said money plus accruable interest and profits to the holders of the five Bearer Certificates of Deposit

---

[21] Plaintiffs specifically allege that: (1) FNBC, through its agent Morgan Guaranty, paid the CDs "with the intent to fulfill its obligations to pay the said [CDs] in full"; (2) ITC "represented to [FNBC] and Morgan Guaranty that they would pay said [CDs] $5,329,513.90 namely . . . in full including principal and interest."; and (3) FNBC "accepted the said representation, and a contract was formed for [ITC] to pay said $5,329,513.90 to the holders of the said five [CDs]." Compl. 14, ¶ 36.

Receipts." Compl. 10, ¶ 18. FNBC is alleged to have "performed its part of the said contract"
and ITC "is now obligated to complete the contract and pay Plaintiff [sic] who are the current
holders of the [CDs] the said $5,329,513.90 plus interest since July 28, 1977." *Id.* at 14, ¶ 37.
However, Plaintiffs allege, despite receiving the amounts payable under the CDs, ITC "has not
completed the transaction by paying and redeeming the [CDs] . . . and said [CDs] are still unpaid
and outstanding." *Id.* at 15, ¶ at 38. Plaintiffs contend that they are "the third party beneficiaries
of the contract between [FNBC] and [ITC], and as holder of the said [CDs] are entitled to
enforce the said contract between [FNBC] and [ITC]." *Id.* at ¶ 39.

There are no facts in the record that would allow a reasonable fact finder to find the
existence of the purported contract or the representations alleged, and therefore the defendant
BNYM is entitled to summary judgment as a matter of law as to Count III based on a complete
absence of evidence to support this claim.

### 4. Count IV: "Quantum Meuit, Quantum Valevant, Unjust Enrichment"

In their final claim, Plaintiffs allege various equitable claims based on allegations that
ITC/BNYM "have had the unrestricted use of the said [amount totaling] ($5,329,513.90) since
July 28, 1977 and has used said funds in its normal banking procedures[]" and have "generated
significant income from its use of said money that should be provided to credit of the holders of
[the CD Receipts] which are with the Plaintiffs." Compl. 16, ¶ 42. Based on these allegations,
Plaintiffs allege that if permitted to keep the proceeds of the CDs, ITC/BNYM "will be unjustly
enriched at the expense and injury of the Plaintiffs. . . ." *Id.* at ¶ 43.

Claims asserted under the legal theories of quantum meruit and unjust enrichment should
be analyzed "together as a single quasi contract claim" under New York law. *Mid-Hudson
Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

"This is because 'unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit . . . is one measure of liability.'" *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 413 (S.D.N.Y. 2011). Thus, to state a claim of unjust enrichment in New York, plaintiffs must prove "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Id.* For the reasons previously discussed, there is no evidence that the defendant's alleged enrichment came at Plaintiffs' expense. Nor is there evidence that any funds deposited with or held by ITC/BNYM came from Plaintiffs, or that Plaintiffs have any entitlement to any funds ever on deposit with ITC/BNYM. The defendant is therefore entitled to summary judgment as a matter of law on Count IV based on an absence of evidence to support the claim.

## Conclusion

For the above reasons, the Court finds and concludes, based on the undisputed facts, that defendant BNYM is entitled to judgment as a matter of law on each count of the Complaint. The Court therefore GRANTS the defendant's Motion for Summary Judgment [Doc. No. 60] and DENIES Plaintiffs' Motion for Summary Judgment [Doc. No. 57].

The Court will issue an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 12, 2013